Case number 16-5029. Stephen Aguiar, Appellant v. Drug Enforcement Administration. Ms. Hansford for the amicus curiae, Mr. Walker for the appellee. Ms. Hansford. Thank you, Chief Judge Garland, and may it please the Court. Masha Hansford, Court-appointed amicus in support of Appellant. At issue in this case is information that falls at the heart of FOIA's purpose, the very information on which the DEA relied in its extensive official investigation of Mr. Aguiar's activities, an investigation that resulted in his criminal conviction. Mr. Aguiar primarily seeks the software that the DEA used in its investigation, and it is undisputed in this case that the software is a record within the meaning of FOIA and that no exemptions apply. And although the DEA had every opportunity in District Court to build a record to establish that this software was not an agency record within its control, it has failed to do so. I would agree with you there's some confusion about what the software is, and if I have to signal, that's what I'm going to be asking on the other side. But I'd like to get your view about what kind of software is an agency record and what kind isn't. So imagine that your client just asked for their copy of Microsoft Word. Yes or no? Is that an agency record? Microsoft Word would be a record under FOIA. Whether it's disclosable would depend on whether it's an agency record, and that would really depend on the facts that came out about the type of contract that Microsoft Word had with the agency and how the agency used Microsoft Word. But what kind of contract would prevent it from being an agency record? Contract factors that would help the government would be, for instance, if the contract said this software is the intellectual property of Microsoft Word, Microsoft Word retains full control over it and is only giving it to the government for a limited purpose. And then if it limited the agency's ability to dispose of the software, that would go to the use and dispose factor. A site license that can't be distributed outside of the site in terms of what the agreement was would not be an agency record. That would be one of the factors. There are four factors, and it's possible that they would weigh in different directions. I'm giving you a hypothetical. It's just Microsoft Word. It's not any of the documents produced by Microsoft Word. It's nothing else. We both know exactly what Microsoft Word is. Can you give me an answer? Weigh them all in your mind, the four factors, and tell me, is it an agency record? I cannot, without more information, give an answer. We can't even be sure whether Microsoft – so if a FOIA requester asks every government agency for a copy of their – we'd like a copy of your Microsoft Word, please. We have to have a big discovery on what the question is. It's not even an easy answer on that. It seems like one you can give up, but you don't have to, but it seems like one that's easy to give up on. Given the agency's burden at the summary judgment stage with just that information, I don't believe it would be enough to make all the factors sufficiently point in the direction. Ultimately, it may turn out that with some more information and some more description of how it uses Microsoft Word and the like, that the agency would be able to meet that burden. Also, Exemption 4 likely would apply, but I believe that simply that assertion, standing alone, would not be enough to carry an agency's burden at summary judgment. What if the software isn't on the agency's computer at all, but it just contracts with a vendor? Pays a vendor with an agreement. Vendor says, you give us this amount of money, we will do this for you. Would that be an agency record? Not the results, but the software itself? Again, that would depend on the details of that particular contract. In this case, the district court invited the DEA to provide that information, and the district court indicated that certain facts about the contract, if the DEA could establish them, those facts would suffice. But the DEA declined to provide that information. So, again, on this record, summary judgment cannot be sustained to the DEA. I readily concede that there are many types of contracts, once sufficiently described by the agency, that would suffice to carry its burden at the summary judgment stage. And not nearly all software would be an agency record, even before you get into the exemption analysis, which for commercially valuable software of the sort may come out fairly easily for the government, especially given contractual provisions indicating an intent to control by the originator. Is the fact that it's a widely used form of software nationally, internationally, public, private, factor in? No, I don't believe it's relevant whether it's widely used or not. The agencies have had to turn over things like district court opinions. Once something comes, once an agency obtains something by accessing it and relies on it in its decision making, whether the requester could get it through other means isn't the issue. No, but I'm trying to figure out, there's not much question that district court decisions are in governmental records in some form. And so the question is, when you have something that's a commercial product, widely available on the market, internationally as well as nationally, and the government simply happens to use that generic software and will stipulate they don't modify it in any way, does that factor in? It seems that it should factor into whether they are controlling, certainly creating, but controlling the software in any relevant way for FOIA purposes. Once again, it may weigh into the particular factors based on the contract on which they receive the software. Wouldn't you worry a bit about putting too much weight on the software? Because the government could then just decide, even if it's having specialized software made for the government, we'd like the vendor who's creating that course to be sure to include in the contract, in the license, that, oh, don't turn this over to anybody else. So I'm not sure what we rely on. Other than if it's a widely available product with consistent contractual terms for private as well as government, it's just hard to figure out what Microsoft Word or Microsoft Outlook is telling us about what the government does. It is true that if the agency is trying to circumvent FOIA requirements, that that would be an issue, at least running a file of executive orders, trying to make them more widely. But focusing on the software in this case, it is software that the agency relied on heavily that was so integral to its official investigation that they actually described it to the jury at Mr. Aguiar's trial. It's software that's essential to understand the DEA's investigation in this case. So the more generic software issue is really far-flung here. And that is significant because, again, it's the DEA's burden on summary judgment, and everything in the record establishes that the software here satisfies these particular factors. There aren't really the countervailing considerations. This is a case where it really does shed light on what the agency is doing. Can you clarify something for me? I get that he wants the software. Does he want also or in the alternative that the software be identified, or does he just actually want the software? She's talking about a government contract here, which would just identify the software. He is seeking the actual software so he can use it and apply it to the data in the way the DEA itself did. And so he can view the data that was provided in the very ways the DEA itself viewed that data. And so he wouldn't be satisfied by them identifying software that he himself could obtain on the market? No, the ability to obtain something from a different source does not satisfy an agency's obligation. Here it's undisputed that the software is a record, and so the presumption of disclosure applies, and the agency needs to establish that it's not something that it controls in order- The identity of the software would itself be a record. Imagine a hypothetical. I'm not suggesting that's what happens here, is that there are two programs for plotting this type of information, electronic information from the GPS onto a map, and one is really, really, really good and reliable, and one is acne super cheapo, and it always gets it wrong. The fact that that's a software, you may want the software, but knowing which software they use, would that itself be an agency record? Information about- In the contract itself. If there's some record that contains that information, absolutely, and that could be something that a requester is seeking. But what Mr. Aguiar here is seeking is more than that. which will also convey information about which software the government uses, but going back to the tax analyst example, the district court opinions were undisputedly not records when they were within the courts, and the requester could have pulled the district court opinions from other sources, but they were still entitled to get them from the agency, because once the agency accessed them and relied on them in official agency decision-making, they became records. That's what I'm trying to figure out, that even something as generic as Microsoft Word or some generic processing program could itself reveal information about how the government did its job if, for example, they were using something known to be very outmoded or unreliable, even if it were generic and you had the contract and these types of things. So wouldn't your theory then require disclosure even with something like Microsoft Word? That's right, and it could, depending on the particular record the agency built about its control and depending on exemptions. There may be situations where something like Microsoft Word would be revealed, and it's hard to draw a bright-line rule, which is the situation we're in, given the government's failure to carry its burden here. I still want to see if I can find a bright-line rule here. Imagine that what the agency does is input street addresses into Google Maps over the Internet. Is Google Maps a government record? Likely not. Okay. So imagine that there's something like Google Maps that puts in longitude and latitude. Instead of typing in your address, you type in longitude and latitude, and there's some program on the Internet that you can go to, type it in. That's it. That's all that happens. Same likely not? The reason that I say likely not has to do with the kind of contract and the terms of access that are likely to be governing that software. It's not impossible that just because software has a certain basic functionality does not mean it could not be a record. No, but I'm telling you what the example is. All the agency does, they don't pay for it just like they don't pay for Google Maps, in my hypothetical. They just enter numbers into the, they type them on their keyboard, and they enter into a program that's kept on Google's server, and instead of it being addresses, it's longitudes and latitudes. That's all I'm talking about. That's everything there is, plus whatever Google, you know, says about its own software, which is no doubt copyrighted to begin with. And again, because of the likely terms and conditions that govern that, the agency would be in a strong position to establish that that's not an agency record. It's not integrated in its files, for instance, if it's accessed purely on the Internet. But on a record like the one here, that would not be enough to sustain the DEA's burden on summary judgment. And just to give an example that may be getting at some of Judge Millat's questions, an agency, if an agency has a formula, for instance, for calculating certain fees in its interactions with the public, and it writes down that formula in a manual, that's an agency record. If it instead chooses to purchase a prepackaged software that applies that same formula, it can't shield the information of what formula it uses, because it's applying it through a program as opposed to writing it down. That's the implication of 552F that says information in any one format remains a record if it's in a different format. So it's hard to draw a bright line rule across the board, given the breadth that the definition of record has, which is undisputed here. Can you give us a rule for your alternative? So your alternative fallback position was, imagine they don't have it, or they don't control it, or whatever. And you want them to produce images of the coordinates plotted onto maps. That's your fallback position. Where is the line between creating a new document and something in an alternative form or format? Where would you draw the line? Sure. There are two requirements for a request to fall within 552A3B. The first is that it has to be readily reproducible, so it needs to be done without excessive difficulty by the agency. That's undisputed here, with good support in the record. The second aspect is that it has to be a form or format of the existing record. And the line, this court's decision in Public Citizen v. Carlin is helpful. It has some dictionary definitions of form that shed light on this. There's a distinction between just the physical attributes and the visual presentation of information versus the substance of content. Here we clearly fall in the physical. But I want you to tell me what the test is before we determine whether we fall into it. So would you agree that if you have to add information, not in one document, regardless of its format, that the new document is not just a change in form or format, but is a different document? Yes, I would agree that if you have to add information that alters the content of the underlying record, it is. And there's one caveat there, which is that any format request you make adds information in some sense. For instance, if you take a physical document and you scan it, you're going to add metadata. If you put it on CD, you reveal what CDs the agency uses. And similarly in this case, by plotting it on any map, you're going to add information about whatever that map happens to be. Let me ask you about the metadata question. If the agency has a written document and scans it, it has to produce the metadata to you? In other words, it is converting it into an electronic format as a consequence of the statute. It must produce the metadata also or not? No, it doesn't need to present. But it may not have a choice but present the metadata. I assume for the moment that it has the choice. So if it adds new information, obviously it has to add coding information in order to switch from pieces of paper to electronics, to pixels to whatever we're transforming it into. But if you add actually substantive information, what if it requires combining two different documents? In other words, you have two documents. Can you be required to combine the two documents? You meaning the agency, I'm sorry. If there's any analysis required, no. If it's simply copying and pasting into a single document, then yes. All right. So now just again, I don't know what the facts are in this case, which is part of the problem, as you've very astutely pointed out. So you now have, your client has anyway, the latitudes and longitudes. They've got a bunch of dots on paper, I guess. Or not dots on paper, numbers, which define longitude and latitude, right? And that's all you have. And say that that is all they have. That's all that the agency has. Now, if they add what you want, which is satellite image plot on Google Maps, you get satellite imagery and you also get streets. Isn't that adding information that was not on the original piece of paper, which just includes longitude and latitude? No, that falls within that second ancillary category I was talking about. Mr. Aguirre has no right to demand that these be plotted on Google Maps as opposed to other maps. All that he can ask is that this latitude and longitude information, which all that is inherently is defining the location of that coordinate on a map. It assumes the existence of a map with a certain grid. That's what the information means. Plotting it on a map just alters it visually. The agency can choose what map to plot on. It doesn't have to provide street addresses and it doesn't have to provide enough of a focus to know anywhere other than here's the world and here is where longitude and latitude cross. Mr. Aguirre would be able to request that it be provided sufficiently zoomed in, for instance, that it helps him see it. But he won't be able to require that it's satellite or not or that it's a certain type of map. Because he doesn't have any ability to ask for information beyond the information in the latitude and longitude on this alternative ground. I guess what troubles me, and I realize you're being pushed by our questions, is since the record here is virtually nil, it's difficult to know what the bright line might be. And as I understood your argument, it's simply this is not suitable for summary judgment, period. What I'm concerned about is some of the answers you're giving means that an agency could simply erase information and say we don't have it. Or, as in this case, give you something or your client something that's virtually useless to him, even though the agency did something to produce information that was useful to it in investigating and prosecuting him. So I think we have to be careful here in this electronic age, because everything can disappear, number one. But number two, the cost to the agency of trying to recreate something that's been, if I can put it this way, deleted, while possible, can be enormous. And let me address both parts of that. As to the first part, that's exactly right. This information falls at the heart of both FOIA's presumption of disclosure and Congress' intent in the 96 amendments to ensure that technology facilitates access to information as opposed to hampering the access. And because the government has failed to build a record, despite the district court's repeated requests that it do so, this court, to rule for the government, would have to adopt a bright-line rule that could have very troubling consequences. The Microsoft Word and Excel cases, I believe, likely would be quite easily disposed of when they actually came up on a full record. But a rule in the other direction could really exclude a lot of things that Congress intended to keep in and shield agency action. And as to the second part of your question, Judge Rogers, the cost to the agency, of course, if the cost is really significant, which in this case, the record indicates it wasn't and the government has not disputed it would be, this is something that could be done automatically, perhaps even by hitting Control-All and just saying print as ping reports. The record doesn't reflect, but some of the exhibits indicate that the software may have that functionality. If there is a cost issue, the readily reproducible aspect of the requirement would resolve it for Mr. Aguiar's narrow request. I wasn't sure it was clear what the limits of that clause are. I mean, it might be readily producible if you're seeking it from Microsoft, for example. But if you're seeking it from DEA and they have a very limited technology operation, are they nonetheless forced to go to the Department of Justice, which in turn has to go? I don't know what the limits of that are. And with the caveat that, of course, that's not disputed here, normally an agency is not required to go to other components. It just has to do things within that particular component. But now we're talking about this new language Congress has enacted. Yes. And that language hasn't been – there aren't that many decisions that have addressed this language. Virtually all courts impose a burden requirement in addition to a technical feasibility requirement that would look at this particular agency's ability to do it easily, as the Ninth Circuit has said in its leading decision in TPS. When an agency does something routinely in the course of official agency business, it's going to be very difficult for it to show that it's not readily reproducible. And this is such a case because Agent Carter testified that he viewed these maps around the clock and the software did it automatically and the like. But – and that is probably why it's not disputed here. But ultimately, readily reproducible is a factual question, and the statute does provide that the agency gets substantial weight in its determination. So that's a way to resolve a lot of those issues, which, again, are not implicated here. Thank you. One other question. Is there any authority you're aware of for the government to have to translate documents from one language into another? Yes. This one didn't speak English. Yes. There's a Third Circuit decision that's cited in the brief that imposed that obligation. That, of course, was – That was a decoding encrypted information, correct? I believe – I believe that was a – that was something of a deletion. It's a translation, but it's decoding. Okay. I apologize. You're not aware of any authority that would require – if, for example, your client didn't speak – spoke Chinese instead of English or whatever, they wouldn't have to – that would be considered creating a record to translate it into a new language? That would likely be considered a record because both it wouldn't be readily reproducible because it would require analysis and effort and time by a human being, and it would – Just put it into Google Translate. Right. If all that's asked is putting it into Google Translate, then the readily reproducible would be satisfied. It would probably not fall within the different form or format because you're altering the content. It depends on how you think of language. So I think that's a harder case. If you're just trying to change the font or – I'm sorry, but you're asking for a translation here from written to visual. The translation from a list versus visual is precisely a form or format translation. It's like having X, Y coordinates and then asking for them plotted on an axis. It's the same information, just viewed different ways. And that's the whole point of the provision, that sometimes data is easier to view in a particular way. Okay. Thank you. We'll hear from Mr. Walker. Thank you. Good morning. May it please the Court, Johnny Walker on behalf of the Drug Enforcement Administration. I want to begin by noting that the DEA did not withhold from Mr. Aguiar any information that it had that was relevant to his investigation. Let me move to the – you're obviously moving to the question I asked, which is what is this software. So as far as I can tell, you're going to have to square a very big circle with respect to all the different statements that the government has made describing it. And maybe the right thing to do is say square the hexagon because there are six different ones. And the most recent one, which is the one that you gave us in the brief, is the DEA did not release the software not because of its nature or the DEA's relationship to it, but because the DEA determined that it simply had no such software. The DEA was unable to find the software that Mr. Aguiar believed to exist. I think probably everybody would agree if that's the case, you don't have it, you can't find it, you don't know where it is, that would be fine. But let me just give you the five other descriptions that the DEA has given the court. In the motion for summary judgment, it says DEA did not produce the software because it is licensed proprietary software. In the reply motion, it says the software is generic or prefabricated out of the box. That's now April 2015 and then May 2015. In the September 2015 notice of compliance, the government says DEA is unsure whether the software is licensed, purchased, or used through another methodology. However, upon information and belief, the defendant believes the software is licensed to the DEA only for official purposes and may not be released to any other party for personal use. In the third Myrick statement, it says the response from both offices was that DEA was not in possession or control of any software. And then in the third Myrick affidavit in another paragraph, it says DEA does contract for a service that allows viewing the location of a GPS tracking device. So that makes six, what I would say, relatively different descriptions. Does the government now know what this software is or does the government's position is just can't find it, doesn't know anything about it? Your Honor, I think that the various statements that you read, while the facts did develop over time and the court ultimately reached the relevant facts at issue, which is common in a FOIA case. This is not a question of you did a bad job before or anything like that. That's not what I'm asking. I just want to know, what's the deal on the software? Can you not find it? Does it not exist? Or is that a different way of saying it's proprietary, it's licensed, it's in a contract or something else? Give us an English where we are here. I think the record in the lower court can be read in conjunction, and I think the various statements ultimately can be read consistently. There is no software. The supplemental MIRAC declaration on which the court ultimately based its ruling on summary judgment in favor of defendant establishes unequivocally that there is no responsive software in the possession or control of the DEA. So are you saying the only thing that you know is what's in the MIRAC? Is that right? We do also know that there is a service that the DEA uses and that it appears Agent Carter used during the investigation in order to track GPS coordinates. So we know that there is a service that is used, but we know that there is no responsive software within the DEA's possession or control. Okay, so that's the part I'm not clear that saying that it's not in possession or control is not the same thing as saying you don't have the software. Right? Because control is a legal term. And as opposing counsel accurately pointed out, control is a consequence of four factors which have to apply, four legal factors, factual factors which are applied. So when you say that you, I'm just trying to get the word, it had no such software. Can you tell us what this means? Does that mean there's no physical software, actually software of course is not physical, but there's no representation of it physically either on a disk or on a server of the DEA? Is that the first thing you're saying? That's precisely how I read the MIRAC declaration, yes. Well, that may be, but I'm not sure I can read it that way because that's not what it says. Do you actually have any, let's step outside of the box here just for a minute. Maybe you can provide a supplemental affidavit. Maybe you can provide a supplemental affidavit to the court. What do you know about this thing? My understanding, Your Honor, of how the software works is there is a third-party vendor. And, again, this is not necessarily in the record, but my understanding is there's a third-party vendor that supplies a computer system. And it's not like it's just one piece of software that can go on a disk. This is a complex system seemingly involving multiple different types and installations of software. But there is a server provided by a third-party, which has the capability of receiving data from GPS devices installed by the DEA. An agent at the DEA can then access those third-party servers, which likely have some kind of software on them to control and organize this data, in order to track those GPS devices in real time. And they can save the data from that tracking to DEA servers. That's what Mr. Aguiar received in this case, is he received a spreadsheet of the data gained by the agent as part of that tracking activity. But the software itself, from what I understand, is on a third-party server that is remotely accessed by DEA. And does the DEA have the ability to take the data which it has saved within the DEA and turn that into a picture, a map? There's no indication that the software provided by the third-party can actually do that with the click of a button. When you say there's no indication, so this is a problem for the government, right? Because the burden is on the government. Obviously no indication the other way either. What's your best understanding? My best understanding is that Agent Carter used the software to track the device in real time and was able to create screenshots of maps in real time during the course of the investigation. There's nothing to indicate that someone can go back into this program and spit out a bunch of maps using the spreadsheet data. Agent Carter also testified that he created some of the maps that were prepared for trial using the publicly available Google Maps software. That's just as available to Mr. Aguiar as it was to Agent Carter. And he did that by inputting longitudes and latitudes? You can input longitudes and latitudes into the Google Map search bar and you will get a map. I've done it myself. And do we know what the contractual agreement is between the contractor who has this software on its servers and the DEA? I don't know the full contractual agreement. I only know it to the extent that I've just described to you. But I can tell you that I can't imagine a licensing agreement from a software provider that would allow the government to just, or anyone, to just give the software, copies of the software out to anyone that it chose. What about printing from the software? Printing from the software is another issue. This is Mr. Aguiar's request that the DEA create maps. I don't think that is readily reproducible. I don't think it is another form or format, and I'm happy to get into that if Your Honor would like to. But what you're saying is that the software itself is not physically at the DEA, is at some contractor which you think owns that software and has licensed only its use by the DEA, but not its ability to transfer. Is that right? There may be some client software on the DEA's computers that allow it to access the remote server, but the heart of the software, yes, Your Honor, my understanding is that's where it is. You see the problem here of us not really knowing what we're dealing with. Yes. Admittedly, Your Honor, the record does not fully describe what the nature of this software is and what the licensing arrangement is. But I do think that there has to be some indication that the software is an agency record. The only indication that's been – I thought in the trial testimony that the DEA agent was using software in his own computer to generate these maps. Now, whether that means software that talks to other software on another server is sort of the open question that we don't have any evidence on. But there is evidence that there was something on a DEA computer that a DEA official used to generate information. Is there not? There certainly is. And my point is that in the complex world of computer software in which we exist, that the fact that a DEA agent was able to use software on a computer is not enough to require the government to conduct a search, if you will, of a third-party server and to provide evidence about its licensing agreement. Why? Why? Why? Because there are – Why isn't it enough to just require it to describe the terms of a licensing agreement? Now, maybe there is some trade secret or something that you want to protect, okay, but I haven't heard that argument. How hard is it to say we don't control this software because, and fill in the blank not with, upon information and belief, which is what was done in the notice of compliance and is certainly not enough for an affidavit, but instead with the terms that prevent the agency from producing the document to the FOIA requester? That doesn't seem very hard. It seems less hard, actually, than searching all your records for these subpoenas, which you did. Correct. There are two reasons, Your Honor. The first reason is that even if the DEA had the ability to take this record from a third-party provider and give it to Mr. Aguiar, that ability to control or access or obtain the software is not enough. It must also possess the software and the affidavit on it. Why do you say that? We have a case about a computer program, HHS, which was in the hands of a contractor, and the court held that notwithstanding that it didn't possess it in the sense of physical possession, it had control, which another word for which, and the government knows well in its drug cases, is constructive possession. So it's not enough that it's not physically at the headquarters. Or do you think differently about that? I do think differently, Your Honor. I think you're referring to the Consumer Enterprises case. Yes, I am. And there are a couple of differences between that case and this case. One is that in Consumer Enterprises, you had an agency head who was receiving and sending e-mails. Oh, no, I'm sorry. I'm not talking about the e-mail case. I'm talking about BRCA. I'm sorry. Oh, I'm sorry. I apologize. I'm not familiar with the facts of BRCA. Okay. Well, it's about computer tape with survey responses that were held by a contractor and not HHS. And the court held that notwithstanding that it wasn't in the agency, it was under the agency's control. Because of the degree of agreement between the agency and the contractor and the agency's use and the various other things that Ms. Hansford described with respect to expectations about getting it later, ability to control it. But we don't have any information like that here. Well, I think the case that you're describing sounds like the 4CHEM case, which was a Supreme Court decision in which the Department of Health, Education, and Welfare had a regulatory right to obtain studies from the recipients of federal grant funds. And the Supreme Court in that case held that there was no obligation on the part of HEW to obtain those studies in order to provide them in response to a FOIA request. So I think that situation, as I say, I'm not fully familiar with the facts of the BRCA case, but I think applying the 4CHEM case, that even if the DEA had the ability to obtain the software that is in the possession of a third party and provide it to Mr. Aguiar, it's not necessarily under an obligation to obtain records to satisfy a FOIA request. So you're saying regardless of the facts, there are no facts in terms of a description of the relationship between the software and the DEA, none, that would allow the court to order the production under FOIA? Is that what you're saying? That's what I'm saying. I think that the supplemental Myrick declaration on which the district court relied and in which the DEA made clear that it has no possession or custody of software responsive to Mr. Aguiar's request is sufficient for summary judgment in this case. What do we have in the record that shows us that the description you're using of this system and its relationship between DEA agents and their computers and the server is the system that existed at the time of this trial? There are bits and pieces of the record, Your Honor. Agent Carter, when he testified about how he operated the software at Mr. Aguiar's trial, testified that he accessed it through the Internet and that he obtained the GPS data through the Internet. So that supports the understanding that this is software that is remotely accessed by the DEA. Well, there's all kinds of stuff one can get through the Internet. It sounds to me like you're describing a sort of specialized contract between a vendor and the DEA right now as opposed to the pre-fabricated software that we were told about at an earlier stage of this litigation. At times it was described as something that sounded like you could pull off the shelf. And so I'm trying to figure out which one is, if what you're telling us now is even relevant to response to his request for information about how his maps were created. Frankly, we don't know precisely how his maps were created. We're reconstructing what we know from the record, from Agent Carter's testimony, and what we know about the services that the DEA contracts for now. Where did the district court notion that this was pre-fabricated, off-the-shelf software come from? I believe, Your Honor, that that came from the notice of compliance. The DEA, in response to a request from the court, filed a notice of compliance that I believe is the source of those. It's actually from, I hate to tell you this, from your own brief, the reply motion, quote, the software is generic or pre-fabricated out of the box. I don't mean you personally, but the U.S. Attorney's Office. And I know that subsequent to that, there was, as I said, it was an iterative process in the district court. The district court asked for additional documentary evidence in the form of a declaration establishing that the software was proprietary and met the description that you have given. And ultimately, Ms. Myrick produced a supplemental declaration saying that there was no possession or custody of the software. And the district court ended up intervening. It was a completely conclusory assertion, you would agree. I don't know. You're just mouthing the words of the test. I don't know. I wouldn't characterize this as conclusory, Your Honor. I don't know how you can be more detailed about the absence of a record. You simply, the only way to state the absence of a record is to state that. And there's all this stuff about, oh, yeah, we know what it is. We know exactly what it is. But, you know, someone else controls it. So no possession or control is just conclusory legal labels. I don't know how we can credit that at all. Well, there's a bit more to it. There's the declaration that there's no possession or control of any such software. There's the description of what steps were taken to ascertain those facts, what offices were consulted. And there's the distinction with the service the DEA knows that it contracts for. So there's a bit more than just the conclusory assertion that there was no possession or control. Is there any authority you're aware of of what this Court's supposed to do if it finds that the record contains flatly contradictory declarations from the same person? Can we rule for the government on the latest declaration? Or does that just inherently create questions of fact? I don't think it does, Your Honor. As I said, I think that the declarations and the previous filings are in some ways describing two different things. They're describing software that is remotely accessed by the DEA and in the possession of a third party. And they're describing what's in the possession and custody of the DEA. I think, ultimately, at the end of the day, there's no contradiction in those. But if we thought there were, would that preclude summary judgment? I don't think so, Your Honor. I think that you can affirm the district court based on the basis that the district court concluded that there was no agency record responsive to Mr. Edgar's request. Because she thought it was prefabricated software. Well, ultimately, the district court concluded that there was no agency record responsive to Mr. Edgar's request based on the supplemental declaration of Ms. Myrick. The district court did note in its opinion that it was concluding no agency record for a different reason than it had initially contemplated. So that would have to be possession or control, right? That has to be the ground, right? Possession, correct. Okay. Well, possession or possession or control? I think right now the record is very clear about possession, the issues of control. How is it clear about possession? It uses the word or, which can be exclusive or inclusive. I'm sorry, Your Honor. There's two uses of the word or, the exclusive use and the inclusive use of or. And all the affidavit says is no possession or control, which could mean there is possession but there's no control, or it could mean neither possession nor control. As I see it, Your Honor, I think that you would have to have both in order for the record to be an agency record. The agency would have to have created or obtained the record and have control. So you think our case, BRCA, which I've now been able to read because it's right here, which distinguished the Fourchamp case is just wrong. Because in that case we expressly said possession is not required, the issue is control. So unfortunately, you know, this panel is bound, and it's not the only decision where we've said this. We've said this several other times. Let me ask you about your other, the alternative, her fallback argument you were about to tell me. So if we take what I think she said, she being your opposing counsel, that all they want as a fallback is longitude and latitudes printed out. They're not asking for streets. They're not actually asking for satellite imagery, although, of course, that wasn't the original request. But we take that all out in the form of some concession at oral argument, and all that has to be produced now is longitudes and latitudes on some kind of map of the world. Do you think that that is not the same document in another format? It is not the same document in another format. As amicus counsel notes, there are not a lot of cases specifically addressing this issue, but I do think that the statute itself offers two clues on what it means by a readily reproducible form or format. The first is in the very next subparagraph following 552A3C, the, I'm sorry, following A3B, which is where the readily reproducible form or format language comes from. The statute says, an agency shall make reasonable efforts to search for the records in electronic form or format. And I think that gives context to the words form or format as in the nature of distinguishing between hard copy and electronic copy. And that's the leading case in this circuit, the sample case. That is what it dealt with. It dealt with whether or not documents needed to be produced in hard copy or electronic copy was readily reproducible. I think it's fair to say that's what they were contemplating in Congress, but they didn't say electronic format. They said form or format. Is the government's position that the only alternative format is electronic? That is, and I'm not sure even what that means when you say it's electronic. No, Your Honor, but I believe that form or format are in that nature. The other clue is the word reproducible. I think what amicus counsel is asking that the government to do is not to reproduce information, but to transform that information into another record, to transform a spreadsheet of data into maps. And she even indicated an oral argument that Mr. Aguiar could even specify in his request what zoom level those maps would take. And that's clearly requiring agency to reproduce a record, which is not required to do under FOIA. The other clue in this statute is that at Section 552d4b, the statute specifies that an agency declaration on what is reproducible is entitled to great weight. And here Ms. Myrick's declaration states that the DEA informed Mr. Aguiar that in order to create the maps, it would have to engage a third-party vendor, which it invited to do, above and beyond its FOIA obligations, if he would prepay the estimated cost of $608.25 for the agency to do that. He declined to pay those costs, and so the maps were not created. So I thought you just told me that you yourself personally have put longitudes and latitudes into Google Maps and produced the results, presumably at less than $630. The Court here is not in a settlement mode, but given the lack of information about the nature of the software, which is their leading request, the government might think about whether it would be easier to just push that button, as you say, or go back to the District Court for discovery on the meaning of the contract, on the meaning of the relationship between DEA and the contractor. Is there any further questions? I actually want to ask you about the search for the subpoenas. Why isn't this a situation where there are so many positive indications that these records have to exist, and there's virtually no explanation of how these records in Vermont were searched? Was it paper? Was it electronic? Was it both? And I went and looked, and his request came in before his conviction was even affirmed on direct appeal. So it strikes me as extraordinary that the DEA would not have records somewhere. A subpoena is issued in a case that is still pending. Criminal cases haven't even yet been resolved on direct criminal appeal. And your notice of compliance said we can talk to the agent. We found him. He's on a bike trip. When he gets back, we can talk to him. Why isn't this just like Valencia, where there's just not sufficient explanation of what was done in Vermont, and the indicia of something is wrong with how this search was done are so powerful? Your Honor, I believe the agent – I'm going to look to my agency confirmation. I believe the agent that was on a bike trip was Agent Carter, who was the agent who conducted the investigation. The agent who issued the subpoenas was Agent Justin Kocher, who was retired at the time of the search. The search did uncover some administrative subpoenas, which I think indicates that the agency looked in the right spot. The merit of a search is certainly not judged by its fruit. It's judged based on whether or not it's – Your Honor, this is a direct criminal appeal. It's still pending. This is not the case that's 10 years after the criminal case. Surely, if the Second Circuit had reversed to go back to trial, you would have had all your trial information somewhere. Where am I assured that all electronic and paper trial records were – or some explanation of how you keep track of your administrative subpoenas, other than we threw some stuff into a database? Maybe I'm wrong, but this strikes me as extraordinary that the government wouldn't be more careful with a pending criminal appeal. Your Honor, I'm speculating, but it could be that the subpoenas were in the possession of the United States Attorney's Office, the prosecuting office at the time, given that the direct appeal was pending. But I think the important thing – Was it in the Burlington – was it the Burlington-Vermont DEA office? I believe it was the Burlington-Vermont U.S. Attorney's Office. In effect, the longitude and latitude data that were provided to Mr. Aguiar were ultimately obtained by the DEA from the Burlington-Vermont U.S. Attorney's Office, which it was not obligated to do under FOIA, but it did that in the interest of satisfying his – The problem here is he didn't submit a FOIA request to the U.S. Attorney's Office? He did not. He did not. But I do think Ms. Myrick's declaration describes an adequate search. She describes the databases. She describes what case filing system those records would be in. They would not be anywhere else. She describes the search terms and how those – Well, they would be somewhere else. They'd be in – not somewhere else in the DEA, but in the U.S. Attorney's Office. Of course, the DEA, however, is only obligated to search the DEA. Okay. Thank you. I know she had no time left, but we'll give Ms. Hanford another few minutes. I can't even borrow it from the previous case. We used it all up. Thank you. I'd like to make three points on rebuttal and a few factual clarifications about the record as well. So, first, Mr. Walker's argument has made crystal clear the inadequate record in this case to, again, sustain the DEA's motion for summary judgment, not an ultimate resolution of whether anything is turned over. But on this record, it cannot be sustained. Of course, this Court cannot rely on factual representations that aren't in the record, which have been shifting potentially because they're not in the record and made for the first time an oral argument on appeal. Even if addressing the merits just a little bit of those representations, the fact that if it turns out ultimately when somebody actually has to put pen to paper under oath that the software is access to third-party servers, that cannot be enough under competitive enterprises, where the Court said, well, yes, something might be in a third-party domain, but is that what really as a practical matter is driving control? And the whole point of FOIA is that- To be fair, that's about e-mails. That's not about the software itself. It's about the substantive content of the e-mails. And it's one thing to say that you control your personal e-mails regardless of what server they're on. And it's another thing to say that, I don't know, Google Mail has to produce its software for generating and sending e-mails over the Internet. Those are two quite different things. Absolutely. And I don't mean to suggest that competitive enterprise would- I'm sorry to focus on Google all the time. I don't mean to suggest that it would bind the result here. But that decision, like many others from this Court, recognizes that the inquiry is a practical one about who actually has control as opposed to what server gets hit in the background, which has nothing to do with the purpose of FOIA. And the reason this is important is it would really let an agency circumvent FOIA. An agency could store its data in incomprehensible encrypted forms and rely on third-party software to decrypt it every single time an agency official wanted to pull it up on its computer but not be able to provide it to FOIA requesters or store videos as lists of pixels and use a third-party software to put those pixels together in a video. There are real problems that can come from a technical interpretation of FOIA. And the Court need not address any of those because there's no record of this here to sustain the burden. But there are issues that, in a case where there is a record, would need to be addressed about such an interpretation. The second point I'd like to make is the request for maps. Ms. Jagger's request for maps is a narrower request. So even if this Court does conclude that he's entitled to the maps, it still does need to resolve the software question  The maps give him one view. So this is not a good alternative for the government to simply produce the maps to you, right? Because now that I think about it, it's not a fallback. In the alternative, it's only if there is no software. Is that right? I don't want to represent what Mr. Aguiar would agree to as a compromise position. He may well agree to it as some kind of settlement. The way in which your argument was made in the briefs is it's only if there is no software. Exactly. But as a legal matter, what he's entitled to under FOIA, it's only if he's not entitled to the software. And then just a few factual clarifications. First, Agent Couture, the agent who issued the subpoenas, is not retired. There's no indication in the record that he is Agent Carter. Can I ask you about it? I didn't see it anywhere. I looked. But I didn't see anywhere in the lower court, I'm sorry, in the district court, where this argument was raised, that they should have asked this agent. Is that right? That's correct. But this is Mr. Aguiar argued that the search for the subpoenas was insufficient because the subpoenas that should have existed did not turn up. Yes, but he didn't suggest. In the other cases in which we've required looking, asking an agent, asking somebody else, the FOIA requester, at some level, either during the FOIA request or in the district court, said you need to ask the agent. And that was not done here, correct? That is correct, Judge Garland. But Mr. Aguiar was, of course, proceeding pro se below and under this Court's decision in Abdel Fattah, and the generous interpretation of a pro se litigant's arguments. The argument that the search was inadequate because subpoenas known to exist were not found should be viewed as encompassing the argument that an agency has an obligation. But this is not so much a question of our normal deference to pro se advocacy. This is a question, because it's FOIA, of having put the government on some kind of notice of where to look. So if we're going to take the position that in every case the government needs to look at agents, even if they don't know which agents you're talking about, it wouldn't matter whether it was pro se or not. I don't know of a case where we've done what you're suggesting in the FOIA context. Our position would be that from this Court's decisions, the government should be on notice when it doesn't find documents that should have been known to exist, that in those cases it should contact a person who has a close nexus, and it should do it even absent a specific request. Of course, here there's an additional inadequacy to the search, that the declarations that the DEA provided do not themselves sufficiently establish the adequacy of the search, and in those circumstances, again, the fact that they're missing documents carries additional weight. Do they have the burden of showing adequacy, or does Mr. Agra have the burden of showing inadequacy? I believe it's the DEA's burden to show an adequate search to sustain its grant of summary judgment. And another factual clarification about the $608.25, the record actually reflects that Mr. Aguirre was never offered the maps for the charge of $608.25. The DEA actually initially wouldn't open the CD at all to see what it contained for $608 until he paid $608.25, and you can see that on pages 136 through 137, and as Chief Judge Garland pointed out, it wouldn't make any sense that it would cost the DEA $608 to do this. I thought they opened in the end the CD and all it has is the longitudes and latitudes, isn't that right? Yes, and after they opened the CD and learned what it had, there was never any subsequent request for payment to convert it. So there's no agency record on how much that would cost. It appears it would be free both from counsel's representations here and from Agent Carter's testimony about how he did it automatically. Presumably every time the DEA is conducting an investigation that's not charging a vendor to create these maps, it's doing it automatically. And Department of Justice regulations, 28 CFR 1610, does require that search and duplication be done in the least expensive and most efficient manner so the DEA can't kind of drum up the charges that it does not actually need to incur. And just one final factual point. The record does not reflect that the server was a third-party server, as Mr. Walker indicated. To the contrary, Agent Carter's testimony, and it's clearest on pages 16 and 25 of the joint appendix, indicates there was a DEA server. The software saved things into the DEA server, and it was actually the ping information that was transmitted over the Internet. So it's unclear how the software itself was functioning, but the Internet information was just about how he received the data from the trackers. Okay, further questions? All right, Ms. Hansford, you were appointed by the court to represent the appellants in this case, and you are a former law clerk of judges of the court, none of the three of us. We're grateful for your assistance. Thank you. We're always grateful for the United States for its assistance. Thank you. We'll take the case under submission.
judges: Garland, Rogers, Millett